DANTE T. PRIDE (SBN 262362)
*dpride@pridelawfirm.com*
SOPHIA REBECCA-MARIE (SBN 354972)
*sophia@pridelawfirm.com*
**THE PRIDE LAW FIRM**
2831 Camino Del Rio South, Suite 104
San Diego, California 92108
Telephone: 619-516-8166
Facsimile: 619-785-3414

Attorneys for Plaintiffs,
GEORGE MEDINA AND ARACELI URBINA VIVEROS

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

GEORGE MEDINA, an individual; ARACELI URBINA VIVEROS, an individual,

Plaintiffs,

v.

CITY OF SAN DIEGO, a municipality; OFFICER NOAH MCLEMORE; OFFICER ANDRES PEREZ QUINTERO; OFFICER ROBERT "DALTON" TROUSAS; OFFICER AUSTIN PAREDES; OFFICER ADDISON ARMSTRONG; OFFICER ANGELA BULL; OFFICER MICHAEL GIDDENS; OFFICER EDGAR GARCIA; OFFICER ARRIFA LUIS; OFFICER ZANE SISNEROS; OFFICER ADAM DEVOR; OFFICER JUAN PONCE, individuals; SCOTT WAHL, an individual; and DOES 1-50, inclusive,

Defendants.

CASE NO. 26-cv-2255-GPC-MSB

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES FOR:**

1. **Violation of 42 U.S.C. § 1983 – Fourth Amendment Unlawful Seizure / False Arrest;**
2. **Violation of 42 U.S.C. § 1983 – Fourth Amendment Excessive Force;**
3. **Violation of 42 U.S.C. § 1983 – First Amendment Retaliation / Interference With Right to Record;**
4. **Violation of 42 U.S.C. § 1983 – Fourth Amendment Unreasonable Seizure / Excessive Force;**
5. **Violation of 42 U.S.C. § 1983 – Municipal Liability (*Monell*);**
6. **Violation of 42 U.S.C. § 1983 – Individual Capacity Supervisory Liability;**
7. **Violation of Bane Civil Rights Act Civil Code § 52.1; and**
8. **Intentional Infliction of Emotional Distress**

**<u>JURY TRIAL DEMANDED</u>**

**-IMAGED FILE-**

Plaintiffs GEORGE MEDINA and ARACELI URBINA VIVEROS ("Plaintiffs"), by and through their counsel of record, hereby alleges the following:

**PARTIES, JURISDICTION, AND VENUE**

1. PLAINTIFF GEORGE MEDINA ("Mr. Medina") is, and at all relevant times was, an individual over the age of eighteen (18) residing in San Diego County, California.

2. PLAINTIFF ARACELI URBINA VIVEROS ("Ms. Urbina Viveros") is, and at all relevant times was, an individual over the age of eighteen (18) within San Diego County, California. Ms. Urbina Viveros is a resident of Texas.

3. This Court has jurisdiction over PLAINTIFFS' federal claims under 28 U.S.C. section 1331 and 1343. This Court has supplemental jurisdiction over PLAINTIFFS' related California-law claims under 28 U.S.C. section 1367 because those claims arise from the same case or controversy.

4. At all times relevant herein, Defendant OFFICER NOAH MCLEMORE (SD1343) ("MCLEMORE") was an individual over the age of eighteen (18) employed by the Defendant CITY OF SAN DIEGO (the "CITY") as an Officer with the San Diego Police Department ("SDPD"). On information and belief, MCLEMORE resides in San Diego County, California.

5. At all times relevant herein, each of the following individuals was an individual over the age of eighteen (18) employed by the CITY as an officer with SDPD, and is sued herein in his or her individual capacity: OFFICER ANDRES PEREZ QUINTERO (SD7858); OFFICER ROBERT "DALTON" TROUSAS (SD7949); OFFICER AUSTIN PAREDES (SD7816); OFFICER ADDISON ARMSTRONG (SD1790); OFFICER ANGELA BULL (SD6817); OFFICER MICHAEL GIDDENS (SD6431); OFFICER EDGAR GARCIA (SD7657); OFFICER ARRIFA LUIS (SD1726); OFFICER ZANE SISNEROS (SD7491); OFFICER ADAM DEVOR (SD7245); and OFFICER JUAN PONCE (SD6859).

On information and belief, each resides in San Diego County, California. Whenever reference is made in this Complaint to the "OFFICER DEFENDANTS," that term refers to Defendant MCLEMORE together with the eleven officers named in this paragraph.

6. Plaintiffs identify the OFFICER DEFENDANTS on the basis of SDPD's own record of this incident. In response to a request under the California Public Records Act, the CITY produced an SDPD Call For Service record for the event at issue, Event No. E25070027687, which identifies each of the OFFICER DEFENDANTS by name and SDPD identification number as an officer connected to the event.

7. At all relevant times, each OFFICER DEFENDANT was acting under color of state law and within the course and scope of his or her employment with SDPD and the CITY. Plaintiffs are informed and believe that each OFFICER DEFENDANT either personally participated in one or more of the acts of seizure and force alleged herein, or observed those acts with a realistic opportunity to intervene and failed to do so. Plaintiffs are presently unable to attribute a particular act to a particular OFFICER DEFENDANT for the reasons alleged below, and therefore plead the roles of the individual participants in the alternative.

8. At all times relevant herein, Defendant SCOTT WAHL ("WAHL") was an individual over the age of eighteen (18) employed as the Chief of SDPD. On information and belief, WAHL resides in San Diego County, California. At all relevant times, WAHL was the Chief of Police at SDPD. As Chief of Police, WAHL is the highest-ranking member of SDPD. WAHL is and has been the final policymaker for SDPD training, discipline, and policy implementation; responsible for approving or maintaining use-of-force and restraint policies; and responsible for post-incident review and corrective action. At all relevant times, WAHL was acting within the scope of his employment with the CITY.

9. Plaintiffs are presently ignorant of the true names and capacities of Defendants DOES 1 through 50, inclusive, and therefore sue those defendants by fictitious names. Plaintiffs are informed and believe that each DOE Defendant was an SDPD officer, supervisor, or policymaking official who personally participated in, directed, authorized, approved, reviewed, or failed to intervene in the acts and omissions alleged herein. So that each fictitiously named defendant has fair notice of the specific conduct attributed to him or her, Plaintiffs assign a DOE number to each functional role in the incident, and will conform these designations to true names when ascertained, as follows:

a. DOES 1 through 3 are the officers who, without warning or command, rushed Plaintiff Mr. Medina and tackled him face-first to the pavement, and who thereafter flipped him from the ground onto his stomach;

b. DOE 4 is the officer who struck Plaintiff Mr. Medina in the face as he hit the ground;

c. DOE 5 is the officer who first forced and then held a knee into Plaintiff Mr. Medina's back while Mr. Medina was prone;

d. DOE 6 is the officer who thereafter climbed onto Plaintiff Mr. Medina's back and applied both knees and his body weight on top of the pressure already being applied by DOE 5;

e. DOES 7 and 8 are the bicycle officers who arrived and positioned their bicycles to form a barrier around the force scene while force was being applied to Plaintiff Mr. Medina;

f. DOE 9 is the officer who deployed chemical irritant spray onto Plaintiff Mr. Medina while he was pinned prone beneath DOES 5 and 6;

g. DOES 10 and 11 are the officers who deployed chemical irritant

spray outward toward the civilian bystanders who had gathered near the force scene;

h. DOE 12 is the officer who shoved Plaintiff Ms. Urbina Viveros to the ground as she raised her phone to record;

i. DOE 13 is the officer who pushed Plaintiff Ms. Urbina Viveros back down to the ground as she attempted to stand;

j. DOES 14 through 16 are the on-scene supervisory officers who observed the force described above, had a realistic opportunity to intervene, and failed to do so; and

k. DOES 17 through 50 are the additional SDPD officers, supervisors, and policymaking officials who participated in, directed, authorized, approved, ratified, or failed to intervene in the acts and omissions alleged herein, and whose particular roles Plaintiffs cannot presently identify.

10. Plaintiffs are informed and believe that the officers described in subparagraphs (a) through (j) of the preceding paragraph are among the OFFICER DEFENDANTS and DOES 1 through 50, and that Defendant MCLEMORE is one of the officers so described. Because each DOE Defendant is identified by the conduct attributed to him or her rather than by identity, each has fair notice of the specific conduct alleged against him or her, whether or not that DOE Defendant is ultimately determined to be one of the OFFICER DEFENDANTS. Plaintiffs are unable to allege with greater specificity which named or fictitiously named officer performed which act because the CITY has disclosed the names of the officers connected to the event but has not disclosed the role, assignment, or specific conduct of any individual officer; the officers involved were wearing bicycle patrol uniforms and helmets; the encounter lasted a matter of minutes in a crowded nighttime setting; and Plaintiffs have not been provided with the body-worn camera

footage, computer-aided dispatch records, arrest reports, or use-of-force reports that would identify each participant and his or her role. Those materials are within the exclusive possession, custody, and control of the CITY.

11. The identities of DOES 1 through 50 are reasonably expected to be ascertained through discovery, including through production of the body-worn camera footage of each OFFICER DEFENDANT, use-of-force and arrest reports, and the personnel roster for the unit and shift deployed in the Gaslamp Quarter in the early morning hours of July 19, 2025. Plaintiffs will promptly seek leave to amend to substitute true names once those identities are known.

12. Defendant the CITY is a public entity, and is a city in the County of San Diego, California.

13. Whenever reference is made in this Complaint to "Involved Officer Defendants," that term refers to the OFFICER DEFENDANTS and DOES 1 through 50, inclusive. Where this Complaint attributes a specific act to a particular officer, it identifies that officer by the DOE number assigned above. Plaintiffs are informed and believe that each of the OFFICER DEFENDANTS personally participated in the seizure and use of force against Plaintiffs, and/or observed that seizure and use of force with a realistic opportunity to intervene and failed to do so, including one or more of the following acts: rushing and tackling Plaintiff Mr. Medina, striking Plaintiff Mr. Medina, applying knee/body-weight pressure to Plaintiff Mr. Medina while prone, creating the bicycle barrier, deploying chemical spray, and/or using force against Plaintiff Ms. Urbina Viveros. At all relevant times, each Involved Officer Defendant acted under the color of state law and within the course and scope of their employment with SDPD and the CITY. The CITY is obligated, under California Government Code §§ 815.2 and 825(a), to pay any compensatory damages awarded against the individual defendants. Nevertheless, the defendants herein are jointly and severally liable for any award of damages.

14. Venue is proper in this Court because the acts and omissions giving rise to the claims alleged herein occurred within the County of San Diego, California, and Defendants reside in, work in, or are otherwise situated within the County of San Diego.

15. On August 27, 2025, Plaintiff Mr. Medina filed a Claim Form with the CITY as required by California Government Code §§ 910, *et seq*. On September 17, 2025, the CITY denied his claim. Mr. Medina timely brings this lawsuit.

16. On September 12, 2025, Plaintiff Ms. Urbina Viveros filed a Claim Form with the CITY as required by California Government Code §§ 910, *et seq*. On September 16, 2025, the CITY acknowledged receipt of Ms. Urbina Viveros's claim. A claim form is "deemed rejected" after 45 days. Ms. Urbina Viveros timely brings this lawsuit.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### *Without Warning: George Medina is Driven to the Pavement*

17. Shortly after 12:00 a.m. on July 19, 2025, George Medina was walking through the Gaslamp Quarter near the intersection of G Street and Fifth Avenue, outside Greystone Bar in downtown San Diego. He had briefly stopped to speak with a friend on the sidewalk and was in the process of leaving the area, continuing on his way through the Gaslamp corridor.

18. As Mr. Medina walked away from the area after speaking with his friend, without warning, and without issuing any commands that would justify a physical takedown, approximately three Involved Officer Defendants (DOES 1 through 3) suddenly rushed Mr. Medina and violently tackled him to the pavement.

19. Before rushing Mr. Medina, no Involved Officer Defendant issued any investigatory commands, asked him questions, told him he matched a suspect description, or identified any complaining witness to him.

20. The force of the takedown drove him face-first into the ground. Within

seconds, additional Involved Officer Defendants converged on him, forming a circle around his body as he lay pinned beneath them.

21. Mr. Medina did not fight back. He did not attempt to flee. He did not strike or threaten any officer. He complied.

22. Despite his compliance, the officers escalated.

23. As soon as Mr. Medina hit the ground, one Involved Officer Defendant (DOE 4) immediately struck him in the face.

24. Then three Involved Officer Defendants (DOES 1 through 3) flipped Mr. Medina onto his stomach. One Involved Officer Defendant (DOE 5) forced his knee directly into Mr. Medina's back and pressed him down into the ground in a prone-restraint position.

25. A second Involved Officer Defendant (DOE 6) then climbed onto Mr. Medina's back and pressed both of his knees into Mr. Medina's back at the same time. Mr. Medina remained face-down on the pavement without resistance. Throughout this encounter, Mr. Medina's head was continuously forced into the pavement.

26. Two additional bicycle Involved Officer Defendants (DOES 7 and 8) arrived and used their bikes to form a barrier around the scene while force was being applied. The Involved Officer Defendants detaining Mr. Medina continued applying knee and body-weight pressure to his back during this time. Mr. Medina appeared not to be moving and was not actively resisting, yet officers remained on top of him driving their knees and body weight into his back while he was prone.

27. While Mr. Medina was immobilized beneath multiple Involved Officer Defendants, he was further sprayed with chemical irritants, including pepper spray, by another Involved Officer Defendant (DOE 9). The prone positioning, stacked body-weight compression, and continued pressure to Mr. Medina's back impeded his ability to breathe and created a substantial risk of positional asphyxia, serious

injury, or death.

28. The burning sensation spread across his face and into his eyes as he struggled to breathe.

29. The scene grew chaotic as Involved Officer Defendants (DOES 10 and 11) discharged pepper spray outward toward civilians who had gathered nearby. At least one nearby woman was pushed to the ground. Civilians attempting to observe what was happening were met with force and chemical spray.

30. At no time did Mr. Medina pose an immediate threat to the Involved Officer Defendants or to the public. He was surrounded, restrained, and compliant. The violence used against him was gratuitous and unnecessary.

31. Eventually, Involved Officer Defendants placed Mr. Medina under arrest and transported him from the scene. He required immediate hospitalization due to the injuries inflicted during the encounter.

32. Throughout Mr. Medina's encounter with SDPD, numerous officers and supervisory officers, including DOES 14 through 16, stood by and watched the use of force continuously increase. Their use of force only increased as time went on despite Mr. Medina's failure to display active resistance to any of the Involved Officer Defendants' commands. The Involved Officer Defendants, including other supervisory officers, failed to ensure proper use of force was utilized throughout the situation. Rather, these SDPD officers, including supervisor officers, continued to escalate the force against Mr. Medina in contravention of SDPD's training and California's POST standards.

33. Although criminal charges were later filed against Mr. Medina, those charges were ultimately dismissed by the District Attorney. No further criminal action has been taken against Mr. Medina. The dismissal reinforces what the scene itself already demonstrated: there was no lawful basis for the arrest and no justification for the force used.

34. As a result of the Involved Officer Defendants' conduct, Mr. Medina suffered serious physical injuries, including broken ribs, facial and bodily pain, pepper-spray exposure, difficulty breathing, hospitalization, humiliation, emotional distress, and the violation of his constitutional rights. He continues to experience physical pain and psychological effects from the assault.

*Araceli Urbina Viveros is Shoved to the Ground for Recording*

35. At the same time and location, Ms. Urbina Viveros was also present near Greystone Bar. She witnessed Involved Officer Defendants suddenly tackle Mr. Medina to the ground.

36. From her vantage point, she observed Involved Officer Defendants striking him and forcing his head into the pavement while he appeared restrained and compliant. Alarmed by what she was seeing, she did what countless citizens lawfully do in public spaces: she took out her phone to record.

37. Ms. Urbina Viveros did not approach Involved Officer Defendants aggressively, did not touch any officer, did not touch Mr. Medina, did not obstruct any officer's movement, and did not interfere with any lawful police activity. She remained a bystander in a public place and simply attempted to document what was unfolding in front of her.

38. At the time Ms. Urbina Viveros attempted to record, she visibly held up her phone to record while Mr. Medina appeared restrained and while multiple officers remained on top of his back, making clear that she was documenting police conduct rather than interfering with it.

39. As she attempted to begin recording, an Involved Officer Defendant (DOE 12) forcefully shoved her to the ground. The shove was sudden and violent enough to knock her phone from her hand and send her palms and knees into the pavement.

40. As she attempted to stand, a second Involved Officer Defendant (DOE

13) pushed her back down again, reinforcing the message that documenting the incident would not be permitted.

41. Meanwhile, Involved Officer Defendants (DOES 10 and 11) discharged pepper spray toward civilians in the area, further escalating the situation.

42. Ms. Urbina Viveros had committed no crime. She posed no threat. Her only action was attempting to exercise her clearly established right to observe and record police activity in a public place.

43. As a direct result of the Involved Officer Defendants' conduct, she suffered bruising to her palms, arms, and feet, physical pain, and lasting emotional trauma. The incident triggered symptoms consistent with post-traumatic stress, heightened anxiety, and depression. What began as an ordinary evening in downtown San Diego ended with her physically assaulted and emotionally shaken for attempting to document public police conduct.

*The Lasting Impact of SDPD's Unlawful Force*

44. The actions of the Involved Officer Defendants were not momentary misjudgments made under threat or duress. They were deliberate acts of force against compliant individuals and a bystander exercising constitutional rights.

45. Mr. Medina was hospitalized and his ribs were ultimately broken. He continues to face ongoing medical and emotional consequences. Ms. Urbina Viveros suffered immediate bruising and scraping. She continues to suffer physical pain and psychological distress stemming from the incident.

46. The conduct of the Involved Officer Defendants — tackling, beating, pepper spraying, arresting without probable cause, and forcibly preventing a civilian from recording — reflects a failure to respect the constitutional boundaries placed on law enforcement.

47. As a direct and proximate result of Defendants' actions, Plaintiffs suffered physical injuries, emotional distress, humiliation, loss of liberty, and

violations of their rights under the United States and California Constitutions.

*SDPD'S Unconstitutional Policies, Customs, and Practices*

48. At all relevant times, SDPD deployed a specialized bicycle enforcement unit in downtown San Diego known as the Gaslamp Enforcement Team, previously the Downtown Bike Team ("Bike Team"). The Bike Team's mission, as described in SDPD's Central Division operations materials, is to "maintain peace and order," "ensure the safety and security of visitors," and provide "quality police services."

49. SDPD's own materials reflect that Bike Team operations specifically focus on nightlife- and crowd-related encounters, including enforcement activity involving "pedestrian traffic," "public intoxication," and "disorderly behavior with nightclub patrons," among other categories common to weekend bar crowds in the Gaslamp Quarter.

50. Public records and official reports recognize that SDPD created and maintains the Bike Team for concentrated weekend-night operations in the Gaslamp Quarter, and that media reports and public accounts describe "clashes between bicycle patrol officers and citizens" that have negatively affected community perceptions of the team.

51. That public concern was later echoed in an official San Diego County Grand Jury report addressing the Gaslamp Enforcement Team, which cited August and September 2024 reporting about Bike Team force incidents as part of the public record surrounding downtown bicycle enforcement.[1]

52. In September 2024, local news reporting described a viral Gaslamp arrest video involving SDPD's bike team. According to that reporting, officers rushed a man, took him to the ground, grabbed and dragged him, and later

---

[1] San Diego County Grand Jury, *The Gaslamp Enforcement Team* 15 & nn.4–5 (2024–2025), https://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2024-2025/gaslamp-patrol/Gaslamp%20Enforcement%20Team-%20Final%20Version.pdf.

handcuffed him. SDPD publicly defended the incident, but the same reporting stated that, after the detention, a witness to the original fight could not identify the man as being involved. Plaintiffs allege that this incident put the CITY and SDPD policymakers on notice of public concern regarding aggressive Bike Team takedowns and force used in Gaslamp enforcement encounters.[2]

53. Plaintiffs further allege, on the basis of that same reporting, that SDPD publicly acknowledged that the man its Bike Team officers rushed and took to the ground in the September 2024 Gaslamp incident was never identified as the suspect in the fight to which officers were responding, and that he was not charged in connection with that fight. The only charge brought against him arose out of the encounter itself — resisting arrest. Plaintiffs allege that this incident placed the CITY and SDPD policymakers on notice of a Bike Team practice of seizing and arresting persons in crowded Gaslamp nightlife conditions on the basis of generalized suspicion, proximity, or association rather than individualized probable cause, and of charging offenses generated by the encounter itself in order to justify a seizure that lacked probable cause at its inception.

54. Plaintiffs are further informed and believe that a citizen complaint concerning the September 2024 Gaslamp Bike Team incident was filed with the Commission on Police Practices and referred to SDPD Internal Affairs for investigation. Plaintiffs allege that the filing and referral of that complaint gave the CITY and SDPD policymakers direct, incident-specific notice of alleged excessive force and unlawful seizure by Bike Team officers in the Gaslamp Quarter.

55. Plaintiffs further allege that SDPD command staff publicly defended the September 2024 takedown, stated that the Bike Team had the Department's complete support, and characterized any misconduct as an isolated problem,

---

[2] Ryan Hill, *SDPD Addresses Recent Viral Arrest Video in the Gaslamp*, ABC 10 News San Diego, https://www.10news.com/news/local-news/sdpd-addresses-recent-viral-arrest-video-in-the-gaslamp (last visited May 5, 2026).

notwithstanding SDPD's own public acknowledgment that additional videos had surfaced depicting SDPD officers pepper-spraying crowds and pushing bystanders. Plaintiffs allege that this public defense of the conduct, unaccompanied by any policy revision, retraining, or discipline, communicated the CITY's approval and ratification of aggressive Bike Team takedown and crowd-force tactics to the officers who carried them out.

56. Separately, and directly relevant to both the force practices and the recording-interference practices alleged here, on or about July 9, 2023, SDPD Bike Team officers seized Muslah Abdul-Hafeez in downtown San Diego while he was attempting to record SDPD's response to a shooting. Mr. Abdul-Hafeez is a well-known San Diego "cop watcher" affiliated with the Southeast San Diego Accountability Unit, a community group that observes and films police encounters. According to his federal complaint and contemporaneous public reporting, he retrieved his cellular phone from his vehicle in order to film officers who had begun detaining people in a downtown parking lot, and he was wearing a high-visibility vest identifying him as a cop watcher.

57. According to those filings and reports, an SDPD Bike Team officer drew a firearm on Mr. Abdul-Hafeez and ordered him to the ground. Although he complied, officers jumped on top of him, dug their fingernails into his skin, and kneeled on him while he lay on the ground; handcuffed him tightly; pulled on his shoulders; and dragged him by his arms. He was detained for hours and cited for obstructing a peace officer. He was never charged with any offense. He was diagnosed with a fractured shoulder together with head, back, and wrist injuries.

58. Mr. Abdul-Hafeez filed a civil rights action against the CITY and SDPD officers in this District in July 2024. On or about June 13, 2025 — approximately five weeks before the incident at issue in this case — the district court denied the CITY's motion to dismiss as to most of his claims. The court held

that his attempt to film police activity in public was protected by the First Amendment, that his arrest constituted an adverse action that would chill a person of ordinary firmness from the future exercise of First Amendment rights, and that the circumstances of the arrest suggested a retaliatory motive. The court further held that he had plausibly alleged the CITY maintains an unconstitutional custom, practice, or policy, crediting video evidence of multiple specific instances in which SDPD officers, including Bike Team officers, used force in a manner that could plausibly be considered excessive. Abdul-Hafeez v. City of San Diego, No. 24-cv-1184-RSH-DDL (S.D. Cal. June 13, 2025).

59. Plaintiffs allege that the Abdul-Hafeez matter placed the CITY and SDPD policymakers, including WAHL, on actual notice before July 19, 2025 that (a) SDPD Bike Team officers were using force against civilians who had complied with commands and were prone on the ground, including by climbing on top of them and applying knee and body-weight pressure; (b) SDPD Bike Team officers were seizing and citing civilians who attempted to record police activity in public, on charges that were not ultimately prosecuted; and (c) a federal court had concluded that those practices were plausibly unconstitutional and plausibly attributable to a custom, practice, or policy of the CITY. Notwithstanding that notice, and notwithstanding the pendency of that litigation against it, the CITY and WAHL did not revise SDPD's use-of-force or restraint policies, did not issue any directive concerning the public's right to observe and record Bike Team enforcement activity, and did not implement corrective training or supervision for Bike Team officers deployed in downtown San Diego.

60. Plaintiffs are further informed and believe that, following the July 2023 incident, Mr. Abdul-Hafeez continued to be detained, cited, and arrested by SDPD officers in connection with his cop-watching activity, and that his counsel publicly stated that this course of conduct had the effect of curtailing his

documentation of police activity. Plaintiffs allege that this continuing course of conduct further placed the CITY and WAHL on notice that SDPD officers were using seizures, citations, and force to deter civilians from recording police activity.

61. In addition to the Bike Team-specific incidents above, reporting based on SDPD internal affairs records reflects repeated findings within SDPD's own disciplinary system involving excessive force, unlawful arrests, and failures to intervene, among other categories of misconduct. Plaintiffs are informed and believe, and on that basis allege, that these findings include complaints and sustained findings arising from enforcement activity by officers assigned to SDPD's Central Division and its downtown bicycle enforcement detail, including the Bike Team. Plaintiffs cannot presently allege the unit assignment associated with each internal affairs matter because SDPD's internal affairs files, complaint intake records, and unit assignment records are within the exclusive possession, custody, and control of the CITY and are not publicly available in a form that identifies the unit to which the involved officer was assigned.

62. By July 2025, the dangers of prone restraint, body-weight compression, and knee pressure on the back of a face-down person were well known in law-enforcement training, litigation, and public discourse. For decades, police departments had been warned that compressing the torso or back of a prone person can create a substantial risk of positional asphyxia, serious injury, or death. The national attention following George Floyd's killing in 2020 further underscored those dangers to municipal policymakers, trainers, and supervisors.

63. Those dangers had been the subject of law-enforcement warning, training materials, litigation, and public reporting since at least the 1990s, well before the events at issue here.

64. More than two decades before the events at issue, the Ninth Circuit held that "kneeling on the back and neck of a compliant detainee, and pressing the

weight of two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061–62 (9th Cir. 2003). Plaintiffs allege that the force used here followed that same dangerous restraint dynamic: Mr. Medina was taken to the ground, immediately struck, flipped prone, and compressed by one officer's knee and then by a second officer stacking body weight onto his back while he was face-down and apparently not resisting.

65. California policymakers and law-enforcement agencies were placed on further notice in 2021 when Assembly Bill 490 amended Government Code section 7286.5 to address positional asphyxia and prohibit law-enforcement agencies from authorizing techniques or transport methods involving a substantial risk of positional asphyxia, including pressure or body weight unreasonably applied against a restrained person's neck, torso, or back without reasonable monitoring.

66. Despite this longstanding notice, SDPD did not revise its policies to clearly prohibit officers from keeping restrained people face-down after control had been achieved or from applying stacked knee or body-weight compression to the back of a prone person.

67. Plaintiffs are informed and believe that SDPD Policy 1.04[3], governing use of force, did not expressly prohibit officers from maintaining a restrained person in the prone position after control had been achieved, did not clearly prohibit continuing to apply knee or body-weight pressure to the back or torso of a prone restrained person, and did not adequately require continual reassessment of whether force remained necessary.

68. Plaintiffs are further informed and believe that SDPD Policy 6.01[4], governing handcuffing, restraining, searching, and transporting procedures, failed

---

[3] SDPD Policy 1.04, Use of Force (July 8, 2020).
[4] SDPD Policy 6.01, Handcuffing, Searching and Transporting (Mar. 10, 2022).

to require officers to promptly move a restrained person from a prone position to a recovery position, failed to require adequate monitoring of breathing and consciousness outside a narrower maximum-restraint context, and failed to clearly warn officers of the dangers of prolonged prone restraint and body-weight compression.

69. Plaintiffs are further informed and believe that SDPD's policies and training failed to adequately instruct officers to distinguish actual resistance from involuntary movement caused by pain, injury, oxygen deprivation, or distress while a person is being compressed in a prone position. This omission increased the risk that officers would misread signs of danger as resistance and respond with even more force.

70. Plaintiffs are informed and believe that these policy omissions were compounded by inadequate training. Publicly filed allegations concerning SDPD's post-AB 490 response state that, in March 2022, SDPD required only a brief online training on positional asphyxia and AB 490.[5] Plaintiffs allege that such limited training was inadequate to address the well-known and potentially lethal dangers of prone restraint, stacked body-weight compression, and the need to distinguish true resistance from involuntary movement caused by pain, injury, or oxygen deprivation.

71. Public reporting and publicly filed allegations also provided incident-specific notice before July 19, 2025, that similar force and crowd-control problems were recurring in Gaslamp bicycle enforcement. In addition, to the September 2024 Gaslamp incident and the downtown cop-watch incident alleged above, on August 19, 2024, local reporting described SDPD bike officers in the Gaslamp pushing people and using pepper spray even as people complied with commands. The same

[5] *San Diego Police Dep't, Order No. OR 22-13, AB 490 Positional Asphyxiation Training - 2022* (Mar. 3, 2022), https://www.sandiego.gov/sites/default/files/or_22-13_redacted_ab_490_positional_asphyxiation_training_-_2022.pdf.

reporting reflected public criticism that officers were overly aggressive toward people leaving Gaslamp bars and clubs. Plaintiffs allege that this reporting placed the CITY and SDPD policymakers, such as WAHL, on notice of recurring problems involving bicycle officers, crowd control, and force escalation in the very nightlife environment at issue here. [6]

72. Plaintiffs are further informed and believe that the Commission on Police Practices' October 2024 *Independent Civilian Audit of San Diego Police Department Complaint Investigations for 2020–2023* found significant deficiencies in SDPD's force investigations and force-related practices. According to that audit, SDPD investigators often failed to analyze whether force was reasonably necessary, only rarely analyzed de-escalation opportunities before force was used, and reflected a command-and-control approach in which officers escalated quickly to force and often failed to intervene when other officers used force beyond that reasonably necessary. Plaintiffs allege that these findings placed the CITY and SDPD policymakers, such as WAHL, on notice of systemic deficiencies in use-of-force review, de-escalation, and intervention before the events at issue here.[7]

73. Plaintiffs allege that the October 2024 audit is relevant not as a prior similar incident but as direct evidence of the CITY's failure to investigate, supervise, and discipline the use of force. The audit examined the very departmental system through which complaints of Bike Team force are received, investigated, and adjudicated. Because complaints arising from Gaslamp and downtown bicycle enforcement are processed through that same system, the deficiencies the audit identified — the failure to analyze whether force was reasonably necessary, the near-absence of any de-escalation analysis, and the

[6] *Violent Clashes with San Diego Police in Gaslamp Caught on Camera*, YouTube (CBS 8 San Diego Aug. 19, 2024), https://www.youtube.com/watch?v=qbfeqKriAN0.

[7] *Independent Civilian Audit of San Diego Police Department Complaint Investigations for the Commission on Police Practices 2020–2023* 42, 51–52 (Law Office of Jerry Threet Oct. 2024), included in *Commission on Police Practices Policy Standing Committee Agenda* (June 5, 2025), https://www.sandiego.gov/sites/default/files/2025-06/cpp-policy-standing-committee-agenda-250605.pdf.

tolerance of officers' failures to intervene — operated to insulate Bike Team force from meaningful review. Plaintiffs allege that the CITY's failure to correct those systemic review deficiencies after receiving the audit was itself a policy of inaction that was a moving force behind the force used against Plaintiffs, including the failure of the on-scene supervisory officers alleged herein to intervene.

74. Public reporting on SDPD's 2023 release of sustained-misconduct records further reflected a pattern of inadequate or undocumented discipline in excessive-force cases. According to March 2023 reporting, nearly one-third of the disclosed misconduct files lacked disciplinary records, including excessive-force cases involving prolonged pressure to a suspect's head, force against a person with hands in the air, force against a person after handcuffing, and failures to provide medical care. Plaintiffs allege that these discipline gaps communicated to officers that serious force violations would not necessarily result in meaningful or documented consequences. [8]

75. Plaintiffs are also informed and believe that SDPD and the CITY had long been on notice of unlawful detention and force by SDPD officers without meaningful corrective action. In prior federal litigation, SDPD officers were alleged and/or found to have engaged in unlawful detention, pepper spray, taser force, and arrest without probable cause, after which the Department allegedly failed to discipline or retrain the involved officers and later promoted some of them.[9] Plaintiffs allege that this history further demonstrated deliberate indifference to recurring Fourth Amendment violations.

76. Plaintiffs are further informed and believe that expert review of SDPD policies has identified the absence of a robust mandatory reporting policy and

---

[8] Jill Castellano & Gustavo Solis, *These Officers Committed Misconduct. But What Were the Consequences?, inewsource & KPBS* (Mar. 8, 2023), https://inewsource.org/2023/03/08/sb16-police-transparency-misconduct-discipline-san-diego/.

[9] *Robinson v. City of San Diego*, 954 F. Supp. 2d 1010, 1014–18 (S.D. Cal. 2013); *Ding v. City of San Diego*, No. 25-cv-01683-AJB-JLB, Order at 19–20 (S.D. Cal. Aug. 2025).

adequate anti-retaliation protections for officers who report misconduct, contributing to a culture in which dangerous force, failures to intervene, and retaliatory conduct can persist without timely correction, particularly in group-force incidents.[10]

77. Based on these recurring publicized incidents involving bicycle officers in the Gaslamp/downtown area, the June 2025 federal court order sustaining custom-and-practice allegations against the CITY based in part on Bike Team force and interference with recording, the City's acknowledged need for specialized Gaslamp bicycle enforcement, and SDPD's documented history of force-related findings, Plaintiffs allege on information and belief that the City and SDPD maintained and tolerated customs, patterns, and practices that included, but were not limited to, the following:

a. Aggressive "rush" tactics and takedowns (including tackling or driving subjects to the ground) in crowded nightlife settings where de-escalation and control tactics are feasible and safer;

b. Seizing, detaining, and arresting persons in crowded nightlife settings on the basis of generalized suspicion, proximity, or association rather than individualized probable cause, and then relying on charges generated by the encounter itself — such as resisting or obstructing — to justify the seizure;

c. Use of prone restraint and body-weight pressure (including knees into the back/torso) on individuals who are already down and not presenting an immediate threat;

d. Use of multiple-officer body-weight compression on prone individuals, including stacking one officer's knees or body weight on top of another officer's pressure while the person is face-down,

[10] *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1244–45 (S.D. Cal. 2014).

subdued, or not moving;

e. Use of pepper spray/chemical irritants in densely populated areas in a manner that foreseeably exposes bystanders and escalates crowd panic rather than resolving the situation;

f. Escalation of force against compliant or non-threatening individuals rather than proportional force calibrated to the actual level of resistance;

g. Interference with and retaliation against civilians who observe, criticize, or attempt to record police activity, including using physical force to stop recording and to deter documentation—particularly during high-visibility downtown incidents;

h. Use of bicycle officers and physical barriers around ongoing force incidents in a manner that foreseeably obstructs public observation and recording during downtown enforcement encounters;

i. Inadequate discipline and accountability for Bike Team officers whose use-of-force incidents generate public complaints, negative public perception, and viral video evidence, resulting in predictable recurrence;

j. Inadequate training and supervision for bicycle officers assigned to weekend-night crowd environments on (i) proportional force and de-escalation in alcohol-related settings, (ii) safe control methods that avoid head strikes and dangerous prone restraint, (iii) crowd-safe chemical agent deployment, and (iv) constitutional protections for civilians who observe and record police activity.

78. Plaintiffs further allege on information and belief that these practices were known to policymakers and supervisors because (a) the Bike Team is a specialized, concentrated deployment in a small geographic area with repeated

public encounters, (b) reports and videos of clashes between bicycle officers and citizens have been publicly documented and recognized in official materials discussing negative public perception, and (c) SDPD's internal affairs system has generated findings related to force and unlawful arrests.

79. Plaintiffs allege that the above customs, policies, and practices were a moving force behind the violations suffered by Plaintiffs in this case, including (i) the violent tackling, beating, head impact, and chemical agent exposure inflicted on Mr. Medina despite compliance and lack of threat, and (ii) the use of force against Ms. Urbina Viveros to prevent recording and to suppress civilian observation/documentation during a public police encounter.

80. Plaintiffs allege that the CITY's failure to adopt, implement, and enforce adequate training, supervision, and discipline for Bike Team operations in the Gaslamp constitutes deliberate indifference to the predictable and recurring risk of constitutional violations in precisely the type of downtown nightlife encounter at issue here.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth Amendment Unlawful Seizure / False Arrest**

***(Against the OFFICER DEFENDANTS and DOES 1-50, inclusive)***

81. Plaintiff Mr. Medina realleges all preceding paragraphs of this complaint and incorporates the same by reference.

82. The Fourth Amendment protects Plaintiff Mr. Medina against arrest and seizure without probable cause.

83. At the time Plaintiff Mr. Medina was seized and arrested, the Involved Officer Defendants lacked probable cause to believe he had committed a crime. Before using force and arresting him, the Involved Officer Defendants did not identify any complaining witness to him, did not ask him any questions, did not advise him that he matched a suspect description, and did not personally observe

him commit any offense.

84. The Involved Officer Defendants intentionally restrained, detained, and arrested Plaintiff Mr. Medina through force and the express or implied threat of force. Plaintiffs are informed and believe that each OFFICER DEFENDANT personally participated in, set in motion, and/or failed to intervene in this unlawful seizure and arrest despite a realistic opportunity to do so.

85. The seizure and arrest was unreasonable and without lawful justification. The Involved Officer Defendants rushed Plaintiff Mr. Medina without warning, threw him to the ground, and arrested him despite his compliance and despite the absence of an immediate threat as alleged above.

86. As a direct and proximate result of the unlawful seizure and arrest, Plaintiff Mr. Medina suffered injuries, damages, loss, and harm according to proof at trial.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Fourth Amendment Excessive Force

***(Against the OFFICER DEFENDANTS and DOES 1-50, inclusive)***

87. Plaintiff Mr. Medina realleges all preceding paragraphs of this complaint and incorporates the same by reference.

88. The Fourth Amendment protects Plaintiff Mr. Medina from the use of excessive and objectively unreasonable force during a seizure and arrest.

89. The force used against Plaintiff Mr. Medina was objectively unreasonable under the totality of the circumstances. He was tackled without warning, driven face-first into the pavement, pinned beneath multiple officers, punched in the face, subjected to knee pressure in his back, and sprayed with chemical irritants while already immobilized.

90. That force included an immediate strike to Plaintiff Mr. Medina's face as he hit the ground, flipping him prone, placing a knee directly on his back, and

then stacking a second officer's body weight and knees onto his back while he was face-down and appeared not to be moving. Plaintiffs are informed and believe that each OFFICER DEFENDANT personally participated in one or more components of that force and/or failed to intervene despite a realistic opportunity to do so.

91. Plaintiff Mr. Medina was not actively resisting, did not attempt to flee, and did not pose an immediate threat to the Involved Officer Defendants or public when the challenged force was used.

92. On-scene supervisory Doe Defendants (DOES 14 through 16) observed the force used against Plaintiff Mr. Medina, had a realistic opportunity to intervene, and failed to do so.

93. As a direct and proximate result of Defendants' excessive force, Plaintiff Mr. Medina suffered physical injury, pain, hospitalization, emotional distress, humiliation, and other damages in according to proof at trial.

## **<u>THIRD CAUSE OF ACTION</u>**

### **42 U.S.C. § 1983 – First Amendment Retaliation / Interference With Right to Record**

### **(Against the OFFICER DEFENDANTS and DOES 1-50, inclusive)**

94. Plaintiff Ms. Urbina Viveros realleges all preceding paragraphs of this complaint and incorporates the same by reference.

95. At all relevant times, Plaintiff Ms. Urbina Viveros was lawfully present in a public place near the intersection of G Street and Fifth Avenue in downtown San Diego.

96. The First Amendment to the United States Constitution protects the right of individuals to observe, document, and record police officers performing their official duties in public spaces, including through the use of a cellular phone camera, subject only to reasonable time, place, and manner restrictions.

97. Shortly after 12:00 a.m. on July 19, 2025, Plaintiff Ms. Urbina Viveros

witnessed Involved Officer Defendants violently tackle and strike Plaintiff Mr. Medina. Concerned by what she observed, she removed her cellular phone with the intent to record the encounter.

98. Plaintiff Ms. Urbina Viveros did not physically interfere with Involved Officer Defendants, did not obstruct their movements, did not approach in a threatening manner, and did not otherwise impede their duties. She stood in a public space and attempted to document police conduct.

99. The force used against Plaintiff Ms. Urbina Viveros was objectively unreasonable and was motivated, at least in substantial part, by a desire to prevent her from recording police activity and to suppress documentation of the Involved Officer Defendants' conduct.

100. Plaintiff Ms. Urbina Viveros attempted to record while Plaintiff Mr. Medina appeared motionless beneath the weight of multiple Involved Officer Defendants. Defendants responded by knocking her phone away and driving her to the pavement, reinforcing that public documentation of the incident would not be permitted.

101. Defendants' actions would chill a person of ordinary firmness from continuing to record or observe police activity.

102. There was no legitimate law-enforcement purpose for shoving Plaintiff Ms. Urbina Viveros to the ground. The force was not necessary to protect officer safety, preserve evidence, or prevent interference. Defendants' conduct was retaliatory in nature.

103. As a direct and proximate result of Defendants' conduct:

a. Plaintiff Ms. Urbina Viveros was deprived of her First Amendment right to record police activity;
b. She suffered physical injury;
c. She experienced pain;

d. She suffered emotional distress, anxiety, humiliation, and ongoing psychological harm.

104. As a result, Defendants are liable to Plaintiff Ms. Urbina Viveros for compensatory damages pursuant to 42 U.S.C. § 1983. The individual Defendants' conduct was malicious, oppressive, and/or in reckless disregard of Plaintiff Ms. Urbina Viveros's constitutional rights, entitling her to an award of punitive damages against the individual officers.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 – Fourth Amendment Unreasonable Seizure / Excessive Force**

***(Against the OFFICER DEFENDANTS and DOES 1-50, inclusive)***

105. Plaintiff Ms. Urbina Viveros realleges all preceding paragraphs of this complaint and incorporates the same by reference.

106. The Fourth Amendment protects Plaintiff Ms. Urbina Viveros from unreasonable seizures and from the use of excessive and objectively unreasonable force.

107. The Involved Officer Defendants intentionally used force to stop Plaintiff Ms. Urbina Viveros from documenting police activity, including shoving her to the pavement and pushing her back down as she attempted to stand. Plaintiffs are informed and believe that each OFFICER DEFENDANT personally participated in and/or failed to intervene in the force used against Plaintiff Ms. Urbina Viveros.

108. Plaintiff Ms. Urbina Viveros had committed no crime, posed no threat, and did not interfere with the Involved Officer Defendants' ability to detain Plaintiff Mr. Medina.

109. The force used against Plaintiff Ms. Urbina Viveros was objectively unreasonable under the totality of the circumstances. To the extent Involved Officer Defendants restrained her movement by driving her to the ground and keeping her

from standing while she attempted to record, that seizure was also unreasonable.

110. At the time, force was used against Plaintiff Ms. Urbina Viveros, Plaintiff Mr. Medina appeared to be restrained while multiple officers remained on top of his back, further demonstrating the absence of any legitimate need to use force against a bystander attempting to document the incident from a public place.

111. As a direct and proximate result of Defendants' conduct, Plaintiff Ms. Urbina Viveros suffered pain, emotional distress, humiliation, and other damages according to proof at trial.

## FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983 – Municipal Liability (*Monell*)**

***(Against the CITY of SAN DIEGO)***

112. Plaintiffs Mr. Medina and Ms. Urbina Viveros reallege all preceding paragraphs of this complaint and incorporate the same by reference.

113. The constitutional violations alleged in this action were committed by SDPD officers acting under the color of state law and within the course and scope of their employment with the CITY.

114. At all relevant times, the CITY, acting through its final policymakers for SDPD operations, including Chief SCOTT WAHL, and through officials responsible for downtown bicycle and Gaslamp-area patrol, maintained, permitted, knew of, and/or ratified municipal customs, practices, and omissions that were a moving force behind the violations of Plaintiffs' rights under the First and Fourth Amendments.

115. Before the events at issue, the CITY was on actual and constructive notice of recurring complaints and publicized incidents involving downtown bicycle officers using aggressive takedowns, prone or body-weight restraint, force against persons who were already down or not presenting an immediate threat, and confrontations with civilians attempting to observe or record police activity.

116. The risk associated with prone restraint and body-weight compression was neither obscure nor novel. By July 2025, the CITY and its policymakers had long been on notice that placing knees or body weight on the back of a prone person can create a substantial risk of positional asphyxia, serious injury, or death, especially when the person is pinned face-down and not moving.

117. The CITY's notice was reinforced by well-known law, statute, policy criticism, and incident-specific reporting. Long before July 2025, the CITY and its policymakers were on notice from *Drummond*, Assembly Bill 490, Government Code section 7286.5, and widespread post-2020 public scrutiny that officers may not keep restrained or subdued person prone under knee or stacked body-weight compression after control is achieved.

118. Plaintiffs are informed and believe that, notwithstanding that notice, SDPD's written policies failed to expressly prohibit maintaining a restrained person face-down after control had been achieved, failed to prohibit stacked knee or body-weight compression on a prone person's back or torso, failed to require prompt movement to a recovery position, and failed to require adequate monitoring of breathing and consciousness outside a limited maximum restraint-context. These omissions were material here because officers allegedly kept Mr. Medina face-down after control was achieved, applied stacked knee and body-weight compression to his back, and failed to move him to a recovery position or adequately monitor his breathing and distress.

119. Plaintiffs are further informed and believe that the CITY's training response was constitutionally inadequate. Rather than implementing robust hands-on supervisory training addressing prone restraint, stacked body-weight compression, recovery position requirements, and the duty to distinguish actual resistance from distress or involuntary movement, SDPD allegedly relied on limited training that was insufficient to correct the obvious risks.

120. The CITY also had incident-specific notice that similar force and crowd-control problems were recurring in Gaslamp and downtown bicycle enforcement. Before July 19, 2025, public reporting described SDPD bike officers in the Gaslamp pushing people and using pepper spray even as people complied with commands, and separately described a viral Gaslamp bike-team arrest video in which officers rushed a man, took him to the ground, grabbed and dragged him, and later handcuffed him. These reported incidents were particularly relevant because they involved the same downtown / Gaslamp setting, bicycle officers, crowd conditions, force against persons on the ground, and aggressive use of force alleged in this case.

121. With respect to the unlawful seizure and false arrest of Plaintiff Mr. Medina, the CITY was on actual and constructive notice before July 19, 2025 of a pattern of Bike Team seizures made without individualized probable cause in Gaslamp and downtown crowd conditions. That pattern included, at a minimum: (a) the September 2024 Gaslamp incident, in which SDPD acknowledged that the man its Bike Team officers rushed, took to the ground, dragged, and handcuffed was never identified as the suspect they were seeking and was charged only with resisting the encounter itself; and (b) the July 2023 downtown seizure of Mr. Abdul-Hafeez, who was ordered to the ground at gunpoint by a Bike Team officer, detained for hours, cited for obstructing a peace officer, and never charged.

122. Plaintiffs allege that these incidents share the features that make them relevant to the seizure of Mr. Medina: the same specialized unit (the Bike Team), the same operational setting (downtown and Gaslamp crowd conditions), the same tactic (a rapid seizure and takedown without individualized investigation, commands, or questioning), and the same aftermath (charges that were never sustained). The CITY received notice of each through public reporting, through a citizen complaint referred to Internal Affairs, and, in the case of Mr. Abdul-Hafeez,

through a federal lawsuit and an order denying dismissal of custom-and-practice allegations against the CITY. The CITY nonetheless made no change to Bike Team policy, training, supervision, or discipline concerning the basis required to seize a person in crowded conditions.

123. With respect to the interference with Plaintiff Ms. Urbina Viveros's right to observe and record, the CITY was likewise on actual and constructive notice before July 19, 2025 of a pattern of Bike Team conduct directed at civilians who attempted to document police activity. That pattern included, at a minimum: (a) the July 2023 downtown seizure of Mr. Abdul-Hafeez, a visibly identified cop watcher who was ordered to the ground at gunpoint, subjected to force while prone and compliant, and cited for obstruction as he attempted to begin filming Bike Team officers, and as to whom a federal court held in June 2025 that the allegations plausibly established First Amendment retaliation and a CITY custom or practice; (b) Plaintiffs' information and belief that Mr. Abdul-Hafeez was repeatedly detained, cited, and arrested thereafter in connection with his documentation of police activity; and (c) the August 2024 reporting, together with SDPD's own public acknowledgment of additional video, describing Bike Team officers in the Gaslamp pushing bystanders and deploying pepper spray toward crowds of compliant persons — the bystanders being, in that setting, the very persons observing and recording the encounter.

124. Plaintiffs further allege that the CITY maintained a practice of using bicycle officers and their bicycles to form physical barriers around ongoing uses of force in downtown enforcement encounters. Plaintiffs allege that this practice, whatever its stated purpose, foreseeably and predictably obstructed public observation and recording of force at the precise moment force was being applied, and that it did so here.

125. Independently and in the alternative, and without regard to any pattern

of prior incidents, Plaintiffs allege that the need to train Bike Team officers concerning the First Amendment right of civilians to observe and record police activity in public, and concerning the individualized probable cause required to seize a person in crowd conditions, was so obvious, and the inadequacy of that training so likely to result in the violation of constitutional rights, that the CITY's failure to provide it constituted deliberate indifference. Officers assigned to weekend-night bicycle enforcement in the Gaslamp Quarter predictably and routinely encounter dense crowds of pedestrians, intoxicated patrons, and civilians holding cellular phones and recording. A constitutional violation of the kind suffered by Ms. Urbina Viveros was the plainly obvious consequence of deploying officers into that setting without adequate training on the right to record and on the limits of a lawful seizure.

126. Independently and in the alternative, Plaintiffs allege that the CITY, through its final policymakers, ratified the unconstitutional conduct alleged herein. SDPD publicly defended the September 2024 Gaslamp Bike Team takedown and affirmed the Department's complete support for the Bike Team, without policy revision, retraining, or discipline. Plaintiffs are informed and believe that no Involved Officer Defendant has been disciplined, retrained, or found to have violated policy in connection with the events of July 19, 2025, and that the CITY has instead approved both the conduct and the asserted basis for it.

127. The CITY further had notice from independent review that SDPD's force supervision and investigations were deficient. Plaintiffs are informed and believe that the Commission on Police Practices' October 2024 Independent Civilian Audit of San Diego Police Department Complaint Investigations for 2020–2023 found that SDPD investigators often failed to analyze whether force was reasonably necessary, only rarely analyzed de-escalation opportunities before force was used, and reflected a command-and-control approach in which officers

escalated quickly to force and often failed to intervene when other officers used force beyond that reasonably necessary.

128. The CITY's disciplinary deficiencies were likewise longstanding and known. Public reporting on sustained-misconduct disclosures in 2023 reflected numerous excessive-force cases with missing or minimal discipline, including cases involving prolonged head pressure, force against a person with hands up, force against a handcuffed person, and refusal of medical care. Plaintiffs allege that the CITY's failure to impose documented and meaningful discipline communicated tolerance of unsafe force and emboldened officers to repeat it.

129. Plaintiffs are further informed and believe the CITY had earlier notice from federal litigation and judicial findings that SDPD officers had engaged in unlawful detention, excessive force, and arrest without probable cause, yet the Department allegedly failed to discipline or retrain the officers and later promoted some of them. Plaintiffs allege that this history of non-correction in the face of prior adjudicated or publicly alleged misconduct further demonstrates deliberate indifference.

130. Plaintiffs are also informed and believe SDPD historically lacked adequate structural safeguards against a code of silence and retaliation for reporting misconduct, including the absence of robust mandatory reporting policy and adequate anti-retaliation protections. Plaintiffs allege that these structural deficiencies contributed to the persistence of unsafe group-force practices, failures to intervene, and retaliatory conduct without timely correction.

131. Based on the prior incidents and recurring operational setting alleged above, the CITY maintained and tolerated customs, patterns, and practices that included aggressive takedowns in crowded nightlife settings, prone or body-weight restraint on subdued persons, crowd-unsafe pepper spray deployment, escalation against compliant persons, and interference with civilians who attempted to observe

or record police activity.

132. Independently and in addition, the CITY failed to adequately train officers assigned to downtown bicycle and Gaslamp patrol in constitutional limits that were obvious and recurring in that environment, including proportional force, the prohibition on applying body-weight or knee pressure to a person who is already down and controlled, safe and constitutional deployment of chemical agents in crowded pedestrian settings, de-escalation techniques tailored to nightlife and crowd-control encounters, and the clearly established First Amendment right of civilians to observe and record police activity in public.

133. Adequate training necessarily required clear instruction that officers may not stack their body weight or knees onto the back of a prone person who is already down, controlled, or not moving, and may not maintain such pressure longer than reasonably necessary. Adequate training also required instruction that bicycle officers may not be used to create barriers that suppress public observation or recording while force is being applied.

134. The need for training in these areas was obvious because officers assigned to the Gaslamp Quarter predictably encounter crowded sidewalks, intoxicated patrons, civilians with cell phones, and high-visibility public interactions in which unnecessary force and retaliation against recording are foreseeable absent adequate constitutional training.

135. Despite that notice, the CITY continued to deploy officers in the same operational setting without implementing adequate corrective training, thereby acting with deliberate indifference to the constitutional rights of persons with whom those officers would foreseeably come into contact.

136. Independently and in addition, the CITY failed to adequately supervise, review, investigate, and discipline officers assigned to downtown bicycle Gaslamp patrol. Despite notice of prior similar conduct, the CITY failed to

meaningfully review patterns of force used by downtown bicycle officers, impose discipline proportionate to sustained excessive-force or unlawful arrest findings, require remedial retraining after prior force incidents, and enforce clear directives protecting the public's right to observe and record police conduct.

137. This pattern of inaction communicated to officers that aggressive tactics in downtown crowd settings would be tolerated and that interference with civilian recording would not result in meaningful consequences. In the context of repeated notice and recurring similar incidents, the CITY's failure to supervise and discipline amounted to deliberate indifference.

138. The CITY's customs, practices, training failures, and supervisory failures were a moving force behind the deprivation of Plaintiffs' constitutional rights. The violent takedown, punch, knee pressure, head impact, chemical-agent exposure, retaliatory shove, and suppression of recording alleged herein were consistent with and flowed from the very practices and omissions described above.

139. The force depicted here—an immediate facial strike, flipping a person prone, pressing one and then two officers' knees and body weight into his back while he is face-down and apparently not resisting, creating a bike barrier around the force scene, and shoving a civilian who attempts to record—is consistent with and emblematic of the unconstitutional customs, training, deficiencies, and supervisory failures alleged above.

140. The CITY's notice and deliberate indifference are further supported by, among other things, the Commission on Police Practices' October 2024 independent civilian audit of SDPD complaint investigations for 2020–2023, local August and September 2024 reporting concerning aggressive SDPD Bike Team force in the Gaslamp, prior federal litigation involving unlawful detention, force, and inadequate discipline by SDPD officers, and the acts and omissions of final policymakers, including Chief WAHL, in failing to correct known policy, training,

and supervisory deficiencies.[11]

141. As a direct and proximate result of the CITY's policies, customs, and omissions, Plaintiff Mr. Medina was unlawfully seized, subjected to excessive force, injured, hospitalized, and damaged; and Plaintiff Ms. Urbina Viveros was subjected to retaliatory and unreasonable force, deprived of her right to record police activity, and injured and damaged in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Individual Capacity Supervisory Liability

### *(Against WAHL)*

142. Plaintiffs reallege all preceding paragraphs of this complaint and incorporate the same by reference.

143. This claim is asserted against Defendant WAHL in his individual capacity for his own acts and omissions in the training, supervision, control, and discipline of SDPD officers, and for his deliberate indifference to known deficiencies that foreseeably resulted in the deprivation of Plaintiffs' rights under the First and Fourth Amendments.[12]

144. At all relevant times, WAHL, as Chief of SDPD, was a final policymaker and exercised supervisory authority over SDPD operations, officer training, use-of-force and restraint policies, post-incident review, discipline, corrective action, and downtown bicycle and Gaslamp-area enforcement practices.

[11] *Independent Civilian Audit of San Diego Police Department Complaint Investigations for the Commission on Police Practices 2020–2023* 42, 51–52 (Law Office of Jerry Threet Oct. 2024), included in *Commission on Police Practices Policy Standing Committee Agenda* (June 5, 2025), https://www.sandiego.gov/sites/default/files/2025-06/cpp-policy-standing-committee-agenda-250605.pdf; *Violent Clashes with San Diego Police in Gaslamp Caught on Camera*, YouTube (CBS 8 San Diego Aug. 19, 2024), https://www.youtube.com/watch?v=qbfeqKriAN0; Ryan Hill, *SDPD Addresses Recent Viral Arrest Video in the Gaslamp*, ABC 10 News San Diego, https://www.10news.com/news/local-news/sdpd-addresses-recent-viral-arrest-video-in-the-gaslamp (last visited May 5, 2026).

[12] See *Estate of Gabriel Jesus Garza v. City of San Diego*, No. 25-CV-1350-TWR (SBC), Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss at 20–23, 28–30 (S.D. Cal. Dec. 22, 2025) (holding similar allegations against Chiefs Nisleit and Wahl were sufficient to state supervisory-liability and Monell theories based on known deficiencies in positional-restraint policies, training, and audit findings).

145. Before July 19, 2025, WAHL knew or should have known that the dangers of prone restraint, positional asphyxia, stacked body-weight compression, and failures to intervene were longstanding, well-documented, and highly relevant to SDPD's downtown enforcement operations. WAHL further knew or should have known that officers assigned to downtown bicycle and Gaslamp patrol predictably encountered crowded nightlife conditions, intoxicated patrons, civilians recording police activity, and recurring situations in which unconstitutional force and retaliation were foreseeable absent adequate training, supervision, and discipline.

146. Before July 19, 2025, WAHL knew or should have known that SDPD's force and restraint policies were deficient with respect to those risks. As alleged above, SDPD did not adequately revise its policies after Assembly Bill 490 and Government Code section 7286.5 to prohibit keeping restrained persons face-down after control had been achieved, did not clearly prohibit stacked knee or body-weight compression on a prone person's back or torso, did not require prompt movement to a recovery position, and did not require adequate monitoring of breathing and consciousness outside a limited maximum-restraint context. Plaintiffs allege that WAHL knew or should have known these deficiencies exposed members of the public to an unreasonable risk of constitutional injury.

147. Before July 19, 2025, WAHL also knew or should have known that SDPD's training and supervisory practices were deficient. As alleged above, SDPD relied on limited training regarding positional asphyxia and prone-restraint risks, failed to provide adequate hands-on training regarding recovery-position requirements, body-weight compression, and distinguishing actual resistance from distress or involuntary movement, and failed to ensure adequate intervention by officers who observed excessive force by fellow officers.

148. Before July 19, 2025, WAHL knew or should have known of recurring incidents, audit findings, policy criticism, and public reporting placing SDPD on

notice of aggressive Bike Team takedowns, crowd-unsafe force, force against persons on the ground, failures to intervene, and confrontations with civilians attempting to observe or record police activity in downtown and Gaslamp enforcement operations. Plaintiffs allege that this notice included, among other things, the August and September 2024 Gaslamp incidents, the Commission on Police Practices' October 2024 independent audit findings, discipline deficiencies reflected in public reporting, prior federal litigation involving unlawful detention and force — including the June 13, 2025 order in the Abdul-Hafeez matter described above — and expert criticism regarding SDPD's lack of adequate mandatory reporting and anti-retaliation protections.

149. In particular, before July 19, 2025, WAHL knew or should have known of the June 13, 2025 order in Abdul-Hafeez v. City of San Diego, No. 24-cv-1184-RSH-DDL (S.D. Cal.), entered approximately five weeks before the incident at issue here, in which the court sustained allegations that an SDPD Bike Team officer drew a firearm on and seized a civilian who was attempting to record police activity, that officers used force on him while he was prone and compliant, that his citation was retaliatory, and that the CITY maintained a custom, practice, or policy under which such conduct occurred. Plaintiffs allege that WAHL, as Chief of Police and the final policymaker for SDPD training, discipline, and policy, was aware of pending federal litigation challenging the practices of the specialized unit he deployed in downtown San Diego, and of a judicial determination that those practices were plausibly unconstitutional.

150. Despite that notice, WAHL did not issue any directive, training bulletin, roll-call training, or policy revision addressing the First Amendment right of civilians to observe and record Bike Team enforcement activity; did not revise the basis required for Bike Team seizures in crowd conditions; and did not require supervisory review of Bike Team seizures that resulted in no charges. Plaintiffs

allege that WAHL's failure to act in the five weeks between that order and the events at issue here, and in the two years following the July 2023 incident that gave rise to it, constituted acquiescence in, and reckless disregard of, the constitutional rights of persons such as Plaintiffs.

151. Despite this notice, WAHL failed to take reasonable corrective action. Among other things, WAHL failed to ensure that SDPD's policies were revised to adequately address prone-restraint and positional-asphyxia risks; failed to implement adequate corrective training concerning proportional force, recovery positions, intervention, and the right to record police activity; failed to ensure meaningful supervisory review and discipline for officers using aggressive force in downtown nightlife settings; and failed to take reasonable steps to mitigate the obvious risk that subordinates would violate the constitutional rights of members of the public.

152. Plaintiffs allege that WAHL's own acts and omissions made it reasonably foreseeable that officers such as MCLEMORE and the other Involved Officer Defendants would engage in unconstitutional force and retaliatory conduct of the type alleged here. WAHL's failure to act in the face of known deficiencies and known risks amounted to deliberate indifference and acquiescence in unconstitutional practices. As a direct and proximate result of WAHL's own acts and omissions, Plaintiffs suffered the injuries, emotional distress, loss of liberty, and other damages alleged herein.

153. The conduct of Defendants also amounts to oppression, fraud, or malice within the meaning of California Civil Code section 3294, *et seq*. and punitive damages should be assessed against each non-public entity defendant for the purpose of punishment and for the sake of example.

## SEVENTH CAUSE OF ACTION

**Violation of Bane Act (Civ. Code 52.1)**

***(Against all Defendants)***

154. Plaintiffs reallege all preceding paragraphs of this complaint and incorporate the same by reference.

155. Plaintiffs had firmly established rights under the First and Fourth Amendments to the United States Constitution to be free from unreasonable seizure, excessive force, and retaliation for recording police activity.

156. The California Legislature declared that it violates the state civil rights act for any person to interfere with the exercise or enjoyment by an individual of his right secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion, or attempted threats, intimidation, or coercion.

157. Defendants interfered with those rights by threats, intimidation, coercion, and violence, including the force used to rush, tackle, pin, punch, knee, pepper spray, and arrest Plaintiff Mr. Medina, and the force used to shove Plaintiff Ms. Urbina Viveros to the ground to stop her from recording police activity.

158. The coercive force used against each Plaintiff was independent from, and in addition to, the constitutional violations themselves and was specifically intended to restrain, intimidate, and deter Plaintiffs from exercising their rights.

159. Plaintiffs further allege that each individual Defendant acted with the specific intent to deprive Plaintiffs of their constitutional rights. As to Plaintiff Mr. Medina, the Involved Officer Defendants continued and escalated force — striking him in the face after he was already down, flipping him prone, stacking a second officer's knees and body weight onto his back, and deploying chemical irritant onto him while he was pinned and immobile — after any need for force had passed, from which Plaintiffs allege a purpose to punish and to inflict harm rather than to

effect a lawful arrest. As to Plaintiff Ms. Urbina Viveros, DOES 12 and 13 shoved her to the ground as she raised her phone and pushed her back down as she attempted to rise, conduct that served no law-enforcement purpose and was undertaken for the purpose of preventing her from exercising her right to record.

160. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered physical injuries, emotional distress, pain and suffering, and other damages according to proof at trial.

161. The conduct of the individual Defendants also amounts to oppression, fraud, or malice within the meaning of California Civil Code section 3294, and punitive damages should be assessed against the non-public-entity defendants for the purpose of punishment and deterrence. Defendant CITY is liable to the extent permitted by law for the acts and omissions of its employees acting within the course and scope of employment.

## EIGHTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

***(Against all Defendants)***

162. Plaintiffs reallege all preceding paragraphs of this complaint and incorporate the same by reference.

163. Defendants' conduct toward Plaintiffs was extreme and outrageous. Defendants violently tackled, pinned, punched, kneed, sprayed, and arrested Plaintiff Mr. Medina despite his compliance and lack of threat; and violently shoved Plaintiff Ms. Urbina Viveros to the ground to stop her from documenting police conduct in public.

164. Defendants acted intentionally or with reckless disregard of the probability of causing Plaintiffs severe emotional distress.

165. As a direct, proximate and foreseeable result, Plaintiffs suffered severe emotional distress, and the outrageous conduct was the cause of the emotional

distress suffered by Plaintiffs.

166. The CITY is vicariously liable under California Government Code section 815.2(a) for the acts and omissions of its employees acting within the course and scope of employment.

167. As a direct and proximate result of Defendants' outrageous conduct, Plaintiffs suffered damages according to proof at trial.

168. The conduct of said defendants also amounts to oppression, fraud or malice and punitive damages should be assessed against said defendants for the purpose of punishment and for the sake of example.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS respectfully pray for judgment against defendants herein and the following relief:

A. Compensatory general and special damages in an amount according to proof at trial;

B. Punitive damages against the individual defendants to the extent permitted by law;

C. For statutory damages, penalties, attorneys' fees, and costs to the extent authorized by law, including under 42 U.S.C. section 1988 and California Civil Code section 52.1;

D. Pre-judgment interest;

E. All such other and further relief as the Court deems necessary or proper.

## JURY DEMAND

PLAINTIFFS demand a jury trial on all issues in this case.

DATED: AUGUST 10, 2026

**THE PRIDE LAW FIRM**

By: ______________________________

DANTE T. PRIDE
SOPHIA REBECCA-MARIE
Attorneys for Plaintiffs,
GEORGE MEDINA
ARACELI URBINA VIVEROS